**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| ANTHONY BEDOLLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. 1:25-cv-220 |
| | ) | |
| CITY OF INDIANAPOLIS and | ) | |
| EDWARD BRICKLEY, Jr., | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

## COMPLAINT

### I. Nature of Case

1. This lawsuit seeks money damages against the City of Indianapolis and one of its police officers whose false testimony and concealment of exculpatory evidence resulted in the criminal conviction and imprisonment of plaintiff Anthony Bedolla for a murder he did not commit. Mr. Bedolla was incarcerated for over fifteen years before the truth was revealed, his conviction vacated, and he was released from prison.

### II. Cause of Action, Jurisdiction, and Venue

2. This action is brought pursuant to 42 U.S.C. § 1983 and is premised on violations of the Fourth and Fourteenth Amendments to the United States Constitution.

3. This Court has original subject matter jurisdiction of the federal questions presented pursuant to 28 U.S.C. §§ 1331 and 1343.

4. Venue is proper in this Court and Division, pursuant to 28 U.S.C. §1391, because the events giving rise to this action occurred in, and/or for all relevant times the Defendants were residents of, Indianapolis, Indiana, which is in the Indianapolis Division of the Southern District

of Indiana.

### III.  Parties

5.      Plaintiff Anthony Bedolla was an adult residing in Marion County, State of Indiana, when he was arrested for and then convicted of a crime he did not commit.

6.      At all relevant times, Defendant Edward Brickley, Jr., was a police officer employed by Defendant City of Indianapolis and acting within the scope of his employment. Defendant Brickley is sued in his individual capacity for both compensatory and punitive damages.

7.      Defendant City of Indianapolis is located in Marion County, Indiana, and is a political subdivision of the State of Indiana. This municipal defendant is sued for compensatory, not punitive, damages.

### IV.  Facts

8.      On March 8, 2009, Erick Espinoza, was shot and killed in the parking lot of an Indianapolis nightclub.

9.      Anthony Bedolla was inside the nightclub when the shooting occurred and was in no way involved in the shooting.

10.      An eyewitness to the shooting identified the shooter to police, described the assailant as dressed like a cowboy with sideburns, and related that he fled the scene after the shooting in a black Honda Civic.

11.      Gerardo Baca Ramirez, a witness, told police that he was walking behind Espinoza in the parking lot at the time Espinoza was shot.

12.      Gerardo Baca Ramirez told police the shooter was wearing a cowboy hat and shirt, had mutton-chop style sideburns, and fled in a black Honda Civic.

13.      Anthony Bedolla did not fit the description of the assailant in any way and has never

had or been associated with a Honda Civic, black or otherwise.

14. Sarai Solano was a member of a criminal gang and worked as a confidential informant for the police.

15. Solano told the police that she witnessed the murder and that Anthony Bedolla was the shooter.

16. Unlike the other eyewitnesses, Solano stated the shooter was wearing a white polo shirt and jeans, had no hat or facial hair, and that he fled the scene in a red Ford Expedition.

17. Anthony Bedolla was wearing a white shirt that night, had no facial hair, and never had or been associated with a Ford Expedition, red or otherwise.

18. Solano also told the police that the shooter was left-handed, and that he was responsible for two other recent shootings.

19. Anthony is right-handed.

20. Anthony was not involved in the shooting of Espinoza.

21. Anthony was in no way involved with the two other shootings that Solano told police he had committed.

22. Solano falsely accused Anthony of these crimes, perhaps in an attempt to cover up for the actual perpetrator, which may have been a man known as Lazaro Suarez, who was in the same criminal gang as Solano.

23. Lazaro Suarez (also known as "El Gallo"), was at the nightclub the night of the shooting.

24. On the night of the shooting, Suarez was wearing a cowboy hat, had sideburns, and owned a black Honda Civic.

25. Defendant Edward Brickley, Jr., was an officer in the Indianapolis Metropolitan

3

Police Department ("IMPD") and was assigned as the lead homicide detective to the case.

26.     Detective Brickley had Solano's statement that Anthony was the shooter, but her version did not match  the other eyewitness testimony.

27.     Brickley had ballistics tests done on the bullet casing recovered from the scene of the Espinoza shooting to the bullet casing recovered from the two other shootings Solano told police Anthony had also committed.

28.     If the ballistics tests matched, it would bolster Solano's version of Anthony's responsibility for the Espinoza shooting, as well as the other two shootings.

29.     Conversely, if the bullet casings  did not match, it would substantially undermine Solano's account of Anthony's responsibility for any of the three shootings.

30.     The ballistics tests did not match.

31.     The ballistics tests seriously undermined Solano's credibility as a witness and her account of Anthony's responsibility for the Espinoza shooting.

32.     Det. Brickley did not disclose to the prosecutor or to Anthony's defense counsel that Solano had told him that Bedolla had shot not just Espinoza but also had shot these two other people, and that is why the ballistics testing was performed.

33.     Instead, when Det. Brickley was deposed by Anthony's defense counsel prior to the criminal trial and was asked why he had conducted the ballistics tests comparing the Espinoza bullet casings to the two other shootings, Brickley did not reveal what Solano had alleged, but rather falsely stated that he had done the ballistics testing comparing the bullet casings in the three shootings "on a whim."

34.     Det. Brickley's false testimony about the reason for his ballistic test comparisons of the three shooting kept the truth about Solano's false allegations from the prosecutor and

4

Anthony's defense counsel, precluding a serious if not fatal blow to Solano's credibility.

35.    Det. Brickley continued his false testimony in this regard at Anthony's criminal trial when he falsely testified that the recorded interview of Solano's statement to him providing her account of the Espinoza shooting was the extent of his interview with her.

36.    Det. Brickley had instead interviewed Solano for a substantial period immediately prior to the recorded interview, and he took notes of that pre-recording interview which documented Solano's false allegations that Anthony had committed not just the Espinoza shooting but the two other shootings as well, allegations about which she was not questioned during the recorded interview. Brickley's notes of that pre-recorded interview reflecting Solano's false allegations were never revealed to the prosecutor or defense counsel.

37.    Solano's credibility was a substantial issue in the case, as no physical evidence connected Anthony to Espinoza's murder, other witnesses claimed another person was the murderer, and Solano's testimony was the principal evidence against him.

38.    Det. Brickley also concealed additional evidence undermining Solano's account of the shooting.

39.    Solano had told Det. Brickley that the Espinoza shooter was left-handed, which Brickley wrote in a draft of a probable cause affidavit for Anthony's arrest.

40.    The fact that Solano identified the shooter as left-handed, and that Anthony is right-handed, also undermined Solano's credibility as a witness and her account of Anthony as the shooter.

41.    After Anthony was arrested, Det. Brickley crossed out the line in the draft of the probable cause affidavit identifying the shooter as left-handed.

42.    Det. Brickley failed to disclose to prosecutors and defense counsel that Solano had

told him that the shooter was left-handed.

43. Det. Brickley did not turn over the draft affidavit to prosecutors or defense counsel.

44. Det. Brickley also turned a blind eye to other evidence which would have undermined Solano's version of events and revealed that another person, likely Solano's fellow gang member Lazaro Suarez, not Anthony, was responsible for the Espinoza shooting.

45. Det. Brickley failed to interview the manager of the nightclub where Espinoza was shot. That manager, Andres Reyes, tried to tell Brickley that they had the wrong man, that Lazaro Suarez was at the bar that night, that Lazaro Suarez had gotten into an argument with Espinoza about a woman, and that Lazaro Suarez had been dressed like a cowboy, had facial hair matching other witnesses' descriptions of the assailant, and owned a black Honda Civic.

46. Lazaro Suarez was known to be associated with Solano and both were alleged members of the same criminal gang.

47. Andres Reyes called Det. Brickley, but Det. Brickley did not return his telephone calls.

48. Det. Brickley did not meet with Andres Reyes to hear his account of what happened.

49. Det. Brickley had heard from others that Suarez may have been responsible for the Espinoza murder as well as another murder and investigated him as a suspect in the Espinoza murder, but this information was not turned over to the prosecution or Anthony's defense counsel.

50. The State turned over photographs taken at the club to Bedolla's defense attorneys, but Det. Brickley did not turn over videos from inside the club to the prosecution or Anthony's defense counsel. These videos were evidence that Anthony was not involved in an argument with Espinoza in the nightclub prior to the shooting, as alleged by Solano.

51. The failure to turn over the videos from inside the club also kept additional proof away from the State and the defense that would have undermined Solano's credibility in her account of the evening's events.

52. Anthony's trial was substantially tainted by Det. Brickley's false testimony and failure to reveal exculpatory evidence to the State and to defense counsel.

53. On February 9, 2010, Anthony was convicted of murder, and sentenced to 45 years in prison for this crime he did not commit.

54. In 2022, the Exoneration Justice Clinic at Notre Dame University's Law School, the Marion County Prosecutor's Office's Conviction Integrity Unit (CIU), and the Exoneration Project began a collaborative re-examination of Anthony Bedolla's conviction.

55. On August 13, 2024, the Exoneration Justice Clinic and the Exoneration Project filed an amended motion for post-conviction relief and a Verified Petition to Vacate Judgment pursuant to Indiana Trial Rule 60(B)(8) on Anthony's behalf in the Marion Superior Court.

56. This motion argued that police had failed to adequately investigate leads and disclose exculpatory evidence that pointed to alternate suspects, undermined the testimony of Solano, or bolstered Bedolla's claim of innocence.

57. The evidence cited in the post-conviction petition included the following facts:

   a. Records detailing the strong possibility that Lazaro Suarez was a viable suspect.

   b. Police also investigated Lazaro Suarez in connection with another murder, and Jose Reyes told investigators that Lazaro Suarez was an associate of Solano.

   c. Lazaro Suarez was photographed at the club on the night of the murder, and he was wearing clothes and had facial hair matching Gerardo Baca Ramirez's description of Espinoza's shooter.

d.  Lazaro Suarez drove a black Honda Civic.

e.  A woman known as Leonor Torres said in an affidavit that one of her children told her that Solano was paid to lie about Bedolla's involvement.

f.  An affidavit from Andres Reyes, the club's manager, said that Lazaro Suarez, whom he only knew by his nickname, was selling drugs at the club and was seen arguing with a woman on the dance floor.

g.  Andres Reyes said he told police when Bedolla was arrested that they had the wrong person.

h.  Andres Reyes said that Det. Brickley didn't return his telephone calls or meet with him to hear his account of what happened.

i.  Andres Reyes testified at one of Bedolla's post-conviction hearings, but he was not asked about Lazaro Suarez because Bedolla's attorney didn't know Lazaro Suarez had been a person of interest.

j.  Videos from the club dance floor did not show Espinoza getting into an argument over a woman, as prosecutors suggested was a possible motive for the shooting.

k.  While the State had turned over photographs taken at the club, it hadn't turned over the videos from inside the club, because IMPD had never turned over this video to the prosecutor.

l.  Police interviewed Gerardo Baca Ramirez for more than an hour before turning on the recording equipment and taking an official statement.

m.  Detective Brickley's notes of that initial interview with Gerardo Baca Ramirez were not turned over to the prosecutor or defense.

n.  Hand-written crossed-out notes in a draft probable-cause affidavit that was never

8

turned over to the prosecutor or Anthony's defense counsel stating that the shooter was left-handed when Anthony is right-handed.

o. The motion also asserted that Brickley testified falsely when he said that his taped interview with Solano was the entirety of their interaction. It wasn't. From Solano, Brickley had learned of the alleged connection between Espinoza's murder and the two other shootings that led to the request for a ballistics comparison. In addition, according to the motion, Brickley testified falsely at a pre-trial deposition about his reasons for ordering that test. It wasn't on a "whim," but rather tied to Solano's information about these shootings. This false statement, the motion said, "turned out to be a successful diversion to defense preparation."

58.    The State of Indiana agreed that Bedolla was entitled to a new trial, because, *inter alia*, the State had not provided Bedolla's trial attorneys with police records on Lazaro Suarez, other alternate suspects, and the potential connection between Espinoza's murder and the other shootings.

59.    The State maintained that it no longer had confidence in the integrity of Bedolla's conviction, as the disclosure violations "precluded [Bedolla] from pursuing a defense and the withheld material bolstered the defense's argument that someone else was responsible for Erick Espinoza's death."

60.    On August 20, 2024, the Marion Superior Court vacated Bedolla's convictions and dismissed the charges.

61.    On August 22, 2024, after more than fifteen (15) years of wrongful imprisonment, Anthony Bedolla was released from prison.

62.    The Defendants' misconduct was undertaken pursuant to the practices of the City

of Indianapolis, acting through the IMPD and its officers, which were in place at all relevant times.

63.     The City of Indianapolis, IMPD, and its detectives and police officers have a long history of abiding by these practices of giving false testimony, withholding exculpatory evidence from prosecutors and defense attorneys, and failing to discipline officers who engage in the foregoing behaviors, causing wrongful incarcerations and convictions in the City of Indianapolis.

64.     Pursuant to these municipal customs and practices and lack of policies, IMPD officers have previously behaved similarly to the Defendants in this case to obtain wrongful convictions. Such actions have included giving false testimony and concealing exculpatory evidence.

65.     There are a number of previous examples of the City's practice of allowing its officers to provide false and misleading testimony with impunity in the wrongful arrest and conviction of innocent individuals, including the following.

**Carlos Starks**

66.     Carlos Starks brought suit against multiple defendants, alleging that *inter alia* IMPD Detective Lesia Moore made false and misleading statements in a probable cause affidavit, which led to Starks' wrongful eleven-month detention in 2010. *Starks v. Moore*, 51 F.Supp. 3d 782 (S.D. Ind. 2014).

67.     Mr. Starks alleged Detective Moore's probable cause affidavit was false and misleading in four respects because Det. Moore: (1) lied when she represented that Mr. Starks had been identified by three witnesses;  (2) lied and exaggerated when she said Mr. Stark provided another law enforcement officer with 'bad' information; (3) omitted material inconsistencies between witness descriptions and Mr. Stark's appearance; and (4) omitted the consistent witness statements that the shooter lived in the Whitfield Square apartments. *Starks*, 51 F.Supp. 3d at 792

(internal citations omitted).

68.    This Court found that Starks presented facts regarding the foregoing allegations that were sufficient to withstand summary judgment. *Id.*

69.    Defendant City of Indianapolis paid Mr. Starks $650,000 to dismiss his case against it and Officer Moore, but did not impose any discipline on Detective Moore for her false sworn statements and her unconstitutional acts.

**William Rainsberger**

70.    In 2014 and beyond, the City of Indianapolis failed to discharge or discipline IMPD Officer Charles Benner, one of its lead homicide detectives, when he admitted under oath that he had falsified a probable cause affidavit which led to the false arrest and prosecution of Willam Rainsberger for the murder of his mother.

71.    William Rainsberger had been arrested and held in jail for two months in 2014 before the criminal charges against him were dismissed by the Marion County Prosecutor for "evidentiary problems."

72.    Det. Benner lied and misrepresented facts in his PCA, and without those lies, probable cause was lacking for Mr. Rainsberger's arrest.

73.    Mr. Rainsberger subsequently brought a civil suit in this Court against Detective Benner for these violations of the Fourth Amendment *See Rainsberger v. Benner*, 1:16-cv-103-TWP-MJD; *Benner v. Rainsberger*, 913 F.3d 640 (7th Cir. 2019) (upholding denial of qualified immunity to Det. Benner).

74.    The City of Indianapolis, although not a defendant to the lawsuit, paid Mr. Rainsberger $490,000 in exchange for him dismissing his case against Detective Benner.

75.    Despite Benner having admitted under oath that he intentionally lied in the probable

cause affidavit, and despite the City paying a substantial sum to relieve Benner of personal liability for these lies, the City never reprimanded or disciplined Benner in any way, instead, it kept him on its police force and allowed him to continue working as a homicide detective, including preparing probable cause affidavits in future cases.

**Leon Benson**

76.    On March 9, 2023, Leon Benson, who had been convicted of a 1998 murder in Indianapolis, was freed from prison after his conviction was vacated.

77.    Mr. Benson's conviction was vacated because evidence pointing to the guilt of another man had been suppressed by IMPD officers.

78.    Benson, who was 22 when he was arrested on August 14, 1998, had spent more than 24 years in custody.

79.    Mr. Benson's exoneration came after the discovery that the lead detective, Alan Jones, had failed to turn over to the prosecution – and consequently Benson's defense – dozens of pages of investigative notes and reports that suggested the real killer was Joseph Webster.

80.    Also not disclosed by IMPD officers was information that contradicted a witness who claimed that he saw Benson commit the murder.

81.    Mr. Benson filed suit in this Court on May 20, 2024, alleging, inter alia, malicious prosecution, fabrication and manipulation of evidence, denial of due process, and a failure of police superiors to prevent misconduct. *See Leon Benson, et al. v. City of Indianapolis, et al.*, Case No. 1:24-cv-00839-JPH-MJD, U.S. District Court for the Southern District of Indiana.

**Detective Michael McWhorter**

82.    In April 2023, the Marion County Prosecutor's Office ("MCPO") advised  IMPD that it questioned IMPD Detective Michael McWhorter's honesty and thoroughness.

83.     The MCPO related that in a homicide investigation, Det. McWhorter provided a probable cause affidavit containing "substantially misleading information" concerning the statement and alleged confession of a suspect.

84.     The MCPO stated that Det. McWhorter also "omitted pertinent, potentially exculpatory information" as well.

85.     Because of the foregoing, the MCPO decided to not file any cases upon which Det. McWhorter was the affiant.

86.     The MCPO also advised all defense counsel of record in cases in which Det. McWhorter was listed as a witness of the above information.

87.     Despite these findings by the Prosecutor, IMPD never fired or imposed any discipline on Det. McWhorter.

**The City of Indianapolis**

88.     The City of Indianapolis's failure to train, supervise, and discipline its officers, effectively caused, condoned, ratified, and sanctioned the kind of misconduct that Defendant Brickley committed against Bedolla.

89.     As a result of the foregoing, Mr. Bedolla suffered injuries, including but not limited to the loss of his liberty, loss of reputation, physical harm, loss of earnings, severe emotional distress, and anguish.

90.     Det. Brickley's misconduct was objectively unreasonable, undertaken intentionally, and he was deliberately indifferent to Mr. Bedolla's clearly established constitutional rights.

## V. CLAIMS

91.     The actions of the Defendants denied Mr. Bedolla  his constitutional rights to be

free from unreasonable seizure in violation of the Fourth Amendment to the United States Constitution and his right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, both actionable pursuant to 42 U.S.C. § 1983.

## VI.  RELIEF REQUESTED

92.     Mr. Bedolla seeks all relief available under the law, including compensatory and punitive damages, attorney fees and costs, and all other appropriate relief.

## VII.  REQUEST FOR TRIAL BY JURY

93.     Plaintiff requests a trial by jury.

Dated: February 3, 2025                                 Respectfully submitted,


                                                        *s/ Richard A. Waples*
                                                        Richard A. Waples
                                                        **WAPLES & HANGER**
                                                        410 N. Audubon Road
                                                        Indianapolis, Indiana 46219
                                                        Tel: (317) 357-0903
                                                        Fax: (317) 357-0275
                                                        rwaples@wapleshanger.com


                                                        *s/ Mark W. Sniderman*
                                                        Mark W. Sniderman
                                                        **SNIDERMAN LAW**
                                                        One Indiana Square, Ste. 1550
                                                        Indianapolis, IN 46204
                                                        (317) 361-4700 Tel
                                                        (317) 361-4004 Fx
                                                        mark@snidermanlaw.com

                                                        *Attorneys for Plaintiff*